[No. 23896-9-II. Division Two. November 24, 1999.]

*In the Matter of the Estate of* KATHRYN MAYDA CURRY.
CAROLE L. POPE, ET AL., *Appellants*, v. KATHY S. CURRY,
*Respondent.*

*Matthew Bryan Edwards* of *Owens Davies Mackie*, for appellants.

*Terrance Wayne Oostenbrug*, for respondent.

*Quentin Wildsmith* of *MacDermid, Liebert, & Morgan, P.S.*, for Estate of Curry.

HUNT, J. — Sisters Carole Pope, Diane Simpson, and Patricia Curry appeal the trial court's interpretation of their deceased mother's will and codicil and the court's resultant

award to each of them of a one-sixth interest in the proceeds from the sale of their mother's home. They contend that each should have received a one-fourth share and that the trial court erred in awarding a one-half interest in the proceeds to their sister, Kathy S. Curry, where it found that the testatrix's intent was to divide her estate equally among her four daughters. Holding that, in the context of this case, the testatrix's codicil words "I trust" direct executrix Kathy Curry to divide the proceeds equally, we reverse.

## FACTS
### I. Drafting of the Will and Codicil

Kathryn M. Curry (Testatrix) lived in a home on the Hood Canal in Belfair (the Canal House). In 1987, assisted by her attorney, Testatrix conveyed an undivided two-thirds interest in the Canal House to her daughter Kathy and her husband for use as collateral for a loan.[1] Testatrix, Kathy, and Kathy's husband then executed a contract requiring Kathy and her husband to reconvey their interest in the Canal House back to Testatrix when they paid off the loan within 12 years. The contract further provided that, if Testatrix died before the loan was paid off, Kathy and her husband would execute promissory notes to Testatrix's heirs, such that the heirs would each receive a share in the home as though title were vested entirely in Testatrix. Simultaneously with executing this contract, Testatrix executed her will (prepared by the same attorney), dividing her estate into four equal shares: Each of three shares were to pass to her daughters Carole, Patricia, and Kathy; the fourth was to pass to the children of her daughter Diane.

---

[1]Kathy and her husband used this collateral to obtain a $119,400 loan, with which they relieved personal debts. According to Kathy, Testatrix's existing $21,600 mortgage on the Canal House was either paid-off upon loan origination or consolidated into the new mortgage. Kathy states in her brief that she had been "paying" on her mother's mortgage for six years, and that approximately 20 per cent of each loan payment was attributable to her mother's mortgage. But she provides no citation to the record to support this assertion.

Testatrix was diagnosed with cancer. On January 11, 1993, she visited her attorney to revise her will, substituting Diane as beneficiary in place of Diane's children, so that all four daughters would receive equal shares of her estate. The attorney expressed concern that the proposed will's testamentary transfer of Testatrix's remaining one-third interest in the Canal House would activate the due-on-sale clause in the deed of trust securing Kathy's 1987 loan, which could be avoided with a codicil to the will.

The attorney drafted a codicil, as a tenth section to the will, which gave Kathy all of Testatrix's interest in the Canal House. The codicil also stated:

> My purpose for leaving [the Canal House] to KATHY . . . is so that she can pay off the loan on the property and I trust her to then give each of my other children . . . an equal share in that real property as though it had been unencumbered at the time of my death.

The attorney proposed this codicil to the revised will, instead of a new will, so that Testatrix could simply cancel the codicil when Kathy repaid the 1987 loan, without having to execute further testamentary documents,[2] such that the revised will would then stand alone. Testatrix executed the revised will and codicil in February 1993. She died in August 1993.

## II. Disposition of the Estate

Seven months later, Kathy wrote her sister Carole that she did not want to keep the house. Instead, she proposed to "sell it, pay off the mortgage, and divide the balance" among her three sisters; she asked Carole how she "felt" about this. Kathy also notified the attorney handling Testatrix's estate that she was going to sell the Canal House, use the proceeds to pay off the mortgage, and then give the remainder to Carole, Diane and Patricia.

Based on Kathy's representations, Carole agreed to travel

[2]Testatrix wanted to minimize lawyers' involvement with her estate.

from her home in Florida to make repairs on the Canal House in order to increase its potential selling price. During the summer of 1994, Carole spent six weeks making repairs. Carole mentioned to Kathy that the Canal House might sell for $650,000 and that they could divide the money four ways; Kathy did not contradict Carole. But Kathy did tell Carole that she (Kathy) possessed a one-half interest in the Canal House.

During the summer of 1995, Carole returned to Washington and spent another six weeks repairing the Canal House. According to a family friend, Ruth Nelson, when asked by Carole what Kathy expected from the Canal House, Kathy replied that "she would be happy to have her loan paid off." At trial, Kathy testified that Nelson did not witness such a conversation; Kathy was not asked, however, whether she had made the statement to Carole.

By the fall of 1995, Kathy had ceased making payments on her 1987 loan, and the Canal House was posted for foreclosure. To prevent foreclosure, Carole and Patricia made payments on the loan.[3] In the spring of 1996, Diane moved into the Canal House and began making improvements. The Canal House sold later that year for $383,844. Kathy told Carole that she wanted to use the proceeds of the sale to pay off her 1987 loan and then to split the remainder four ways. According to Kathy, Carole responded that Kathy should receive nothing more than $5,000 as a "gift" after the loan was paid off. Kathy denies ever promising Carole to divide the sale proceeds into four shares and then to use her share to pay off the loan.

The estate paid off the balance of Kathy's loan ($95,516). Kathy kept the remainder of the house sale proceeds for herself. In January 1997, Carol, Diane, and Patricia filed suit. The trial court ordered that the estate reimburse Carole, Diane, and Patricia for payments they had made on the

---

[3]Carole paid $20,165.41 on the 1987 loan, and Patricia paid $7,381.81.

1987 loan and for the materials they had purchased to improve the Canal House.[4]

Following a bench trial in April 1998, the trial court issued a memorandum decision, findings of fact, and conclusions of law. The trial court found:

> It was Kathryn M. Curry's desire and intent that in the event of her death, all of her property be distributed equally amongst her four daughters.

The trial court held as a matter of law that the "I trust" language in the codicil was precatory, not imperative. Accordingly, the trial court ruled that: (1) at the time of her death, Testatrix possessed a one-third real property interest in the Canal House, and a personal property interest (based on the 1987 contract) in Kathy's and her husband's two-thirds interest in the Canal House; (2) Testatrix's one-third real property interest in the Canal House passed entirely to Kathy under the codicil; (3) Testatrix's two-thirds personal property interest in the Canal House passed equally to all four daughters, giving each daughter a one-sixth interest in the Canal House; (4) the estate funds used to repay the 1987 loan should be set-off against Kathy's share of the estate; and (5) Kathy's promises regarding division of the Canal House sale proceeds were not enforceable.

The trial court determined that Kathy was entitled to a one-half interest in the Canal House sale proceeds, and that Carole, Patricia, and Diane were each entitled to a one-sixth interest. An order of interim distribution was entered in November 1998, giving Carole, Patricia, and Diane each, $46,000. It is unclear how much of the sale proceeds Kathy received after the loan set-off.

## ANALYSIS
### I. Interpretation of the Will

Interpretation of a will is a question of law, which

---

[4]Carole, Patricia, and Diane were reimbursed approximately $11,255, $1,341, and $5,551, respectively, for improvement expenses.

we review de novo where, as here, the trial court's factual findings are not in dispute and are deemed verities on appeal. *See Moreman v. Butcher,* 126 Wn.2d 36, 39, 891 P.2d 725 (1995); *Espinoza v. City of Everett,* 87 Wn. App. 857, 865, 943 P.2d 387 (1997); *Erickson v. Reinbold,* 6 Wn. App. 407, 422, 493 P.2d 794 (1972). "The primary duty of a court when interpreting a will is to determine the intent of the testator." *Estate of Niehenke,* 117 Wn.2d 631, 639, 818 P.2d 1324 (1991); *see also* RCW 11.12.230. " 'This intent should, if possible, be garnered from the language of the will itself. The will should be considered in its entirety and effect given to every part.' " *In re Estate of Campbell,* 87 Wn. App. 506, 510, 942 P.2d 1008 (1997) (quoting *In re Estate of Price,* 73 Wn. App. 745, 754, 871 P.2d 1079 (1994)). "Similarly, in searching for the testator's intention, a codicil and will should be construed together." *Estate of Smith,* 40 Wn. App. 790, 793, 700 P.2d 1181 (1985).

 Extrinsic evidence of surrounding facts and circumstances may be admitted to explain the language of a will when uncertainty arises as to the testator's true intention. *In re Estate of Bergau,* 103 Wn.2d 431, 436, 693 P.2d 703 (1985). But extrinsic evidence may not be considered " 'for the purpose of proving intention as an independent fact, or of importing into the will an intention not expressed therein.' " *In re Estate of Patton,* 6 Wn. App. 464, 467-68, 494 P.2d 238 (1972) (quoting *In re Estate of Lidston,* 32 Wn.2d 408, 418, 202 P.2d 259 (1949)).

## II. Codicil—"I trust"

Carole, Patricia, and Diane challenge the trial court's legal conclusion that a testamentary trust was not created by the codicil language, "I trust [Kathy] to then give each of my other children . . . an equal share" in the Canal House. In divining the testamentary intent behind this language, the trial court applied the seven criteria suggested by the American Law Institute:

(1) the imperative or precatory character of the words used;

(2) the definiteness or indefiniteness of the property; (3) the definiteness or indefiniteness of the beneficiaries or of the extent of their interests; (4) the relations between the parties; (5) the financial situation of the parties; (6) the motives which may reasonably be supposed to have influenced the settlor in making the disposition; [and] (7) whether the result reached by construing the transaction as a trust or not a trust would be such as a person in the situation of the settlor would naturally desire to produce.

RESTATEMENT (SECOND) OF TRUSTS § 25 cmt. b (1959).

## A. Character of words

■ It has generally been held that an imperative command to dispose of the property for the benefit of another is required to create a testamentary trust. Precatory words are not enough to create a trust and if the grantee has discretion to use the property for herself the court will not find a trust.

*In re Estate of Brooks*, 20 Wn. App. 311, 313, 579 P.2d 1351 (1978) (citation omitted). But the context in which dispositional words are used can convert ostensibly precatory expressions[5] into imperative commands.[6]

The codicil at issue here provided, in pertinent part:

I, **KATHRYN MAYDA CURRY**, a resident of Kitsap County, State of Washington, being of legal age and not acting under any duress, menace, or undue influence on [sic] any person whatsoever, do hereby make, publish, and declare this to be a codicil to my Last Will and Testament, which was exe-

---

[5]An expression is "precatory" if it is in the nature of a request, recommendation, or expression of a desire for action "in a nonbinding way." BLACK'S LAW DICTIONARY 1195 (7th ed. 1999).

[6]*See* GEORGE G. BOGERT & GEORGE T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 48, at 78-81 (2d rev. ed. 1984). *E.g., Cowles v. Matthews*, 197 Wash. 652, 656, 86 P.2d 273 (1939) (finding the phrase, "It is my will and desire," to be imperative based on the context in which used); *In re Estate of Hochbrunn*, 138 Wash. 415, 417-18, 244 P. 698, 49 A.L.R. 7 (1926) (finding the language, "special request," to be imperative when viewed in context).

cuted on the 19th day of February, 1993. I hereby amend that Last Will and Testament, as follows:

## I.

I am adding a TENTH SECTION as follows:

I leave to my daughter, KATHY SUZANNE CURRY, all of my interest in the residential real property where I reside both in the house and the real property. . . .

. . . .

My purpose for leaving this real property to KATHY SUZANNE CURRY is so that she can pay off the loan on the property and I trust her to then give each of my other children PATRICIA JOAN CURRY, CAROLE LOUISE POPE, and DIANE JUNE SIMPSON, an equal share in that real property as though it had been unencumbered at the time of my death.

Noting that neither party had provided citations to any cases using the same language, the trial court reviewed a number of cases involving both precatory and imperative language. Following this review, the trial court interpreted the codicil's "I trust . . ." language as being precatory for the following reasons: (1) The first clause of the codicil, as it added a tenth section to the will,[7] "makes an outright devise to . . . Kathy Curry, of all the testatrix's interest in the Canal House"; (2) the phrase that follows does not use "words often found to create an enforceable trust, e.g., 'desire,' 'will,' 'request' "; (3) "[n]or is it stated that this interest in the Canal House is left 'in trust.' " The trial court then concluded:

> The phrase used in the First Codicil, "I trust her", is not an imperative or directorial phrase. The word "trust" is used in the First Codicil in a manner to describe the testatrix's state of mind or expectation rather than to make a directive or command to Kathy Curry.

We review de novo the trial court's interpretation of the

---

[7] "I leave to my daughter, KATHY SUZANNE CURRY, all of my interest in the residential real property where I reside both in the house and the real property. . . ."

phrase "I trust." Even assuming that this phrase in isolation could be deemed precatory, as the trial court so held, we hold that taken in context here, the phrase is imperative, especially given the strong evidence and the trial court's express finding of fact that Testatrix clearly intended an equal devise to each of her four daughters. We note also the conditional nature of Testatrix's transfer of her interest in the Canal House to Kathy and the circumstances surrounding execution of the extinguishable codicil, with their limited, temporary purpose to allow Kathy first to obtain and later to pay off a substantial personal loan. In so doing, Testatrix never intended Kathy to reap a share of the estate larger than her sisters' shares. Rather, if Kathy repaid the loan before Testatrix died, the codicil was to be destroyed. If Kathy failed to repay the loan before Testatrix died, Kathy and her husband were to execute promissory notes to Kathy's three sisters such that the four sisters would ultimately receive equal shares of the estate.

In its verb form, to "trust" means to be confident, to depend, or to hope. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2456 (1969). Although we find no Washington cases on point, other jurisdictions have confronted these words with varying results. For instance, in *Hadley v. Hadley*, the Tennessee Supreme Court held that a testator had intended to create a trust when he wrote in his will:

> I may have [devised] to one [of my sons] more [land] than I intended. I *trust* to the sense of justice of my . . . sons, that, if I have given more to one than the other, that they will do right, and [I] authorize my wife, as trustee, to assist them in arriving at justice.

100 Tenn. 446, 45 S.W. 342, 342 (1898) (emphasis added). Recognizing the facially precatory nature of the words, the court ruled that treating the words as anything less than imperative would controvert the testator's intention, as indicated by his repeated expressions throughout the will that his sons be treated equally. *Id.* at 343, 344.

In *Sears v. Rule,* the California Court of Appeal faced a

.

testatrix's devise of the residue of her estate to her brother, conditioned by the language, "I am *confident*, and place my *trust* in him to the extent that he will distribute my estate in accordance with my wishes he and I have often discussed." 45 Cal. App. 2d 374, 114 P.2d 57, 60 (1941) (emphasis added). Although the court found the language precatory and insufficient to create a trust, it nonetheless concluded that use of the words "confident" and "trust" in relation to the directive "will distribute" indicated that the testatrix did not intend her brother to receive the residue of the estate; therefore, the court implied a trust for the benefit of the estate's heirs. *Id.* at 62-63.

In *Fidelity Title & Trust Co. v. Clyde*, the Connecticut Supreme Court held that a trust was created by the following language:

> If I have any property left after the payment of my debts, I give . . . the same to Ethel Clyde . . . and Leslie Kuhn . . . to be expended in the collection and arrengement, [sic] and publication of my writing. I have *confidence* in their judgement and honesty. I therefore request that [they] be allowed to serve without bond.

143 Conn. 247, 121 A.2d 625, 627 n.1 (1956) (emphasis added). The court reasoned that the testator would not have expressed "confidence" in Clyde's and Kuhn's judgment and honesty, nor would she have requested that they serve without bond, if she had intended an absolute gift to Clyde and Kuhn. *Id.* at 628-29.[8]

Here, the trial court reviewed and cited in its memoran-

---

[8]But compare *Sexton v. West View Land Co.*, in which the Kentucky Court of Appeals ruled that a testator's expression of "explicit confidence" in his son to treat the testator's other children "justly" regarding access to real property devised to the son, was insufficient to convert the phrase "wish and request" into an enforceable command. 288 S.W.2d 352, 353 (Ky. Ct. App. 1956). Also, in *In re Estate of Bolinger*, the Montana Supreme Court held that no trust was created from the language,

> I intentionally give nothing to my three children. . . . I make this provision for the reason that I feel *confident* that any property which either my father or my step-mother . . . receive from my estate will be used in the best interests

dum decision a Washington case interpreting the words "special request," *In re Estate of Hochbrunn*, 138 Wash. 415, 416, 244 P. 698, 49 A.L.R. 7 (1926). We, too, find this case enlightening, but reach a conclusion contrary to the trial court's. As the trial court here noted, the contested language in *Hochbrunn* was as follows:

> I give and bequeath to my brother . . . the entire residue and remainder of my estate . . . with the special request to my . . . brother that he pay to my sister . . . the sum of Ten Thousand ($10,000.00) Dollars out of the proceeds of my estate as soon as possible after my decease; the same may be paid to her by installments, if necessary, but request that no unnecessary delay be made, provided she may survive me.

*Id.* at 416. Although this "request" language was not as overtly imperative as other words might have been, the Washington Supreme Court held:

> Where a person makes a special request of another who is independent of him, it may be altogether ignored; but if in making a bequest to him capable of being fulfilled, and, in the same instance, specially requests that a portion of it be paid to another at a time sufficiently definite, *the courteous language used makes it no less imperative* than if he had commanded or ordered it to be paid. There is no technical meaning of the words "special request," or even the simple word "request," inconsistent with its being a common word that anyone, whether layman or lawyer, may use in his will to express his intention of imposing an obligation.

*Id.* at 418-19 (emphasis added). The court went on to note that when used in wills, the words "request" and "desire" have "often been held to be imperative" and "sufficient to create a trust." *Id.* at 419.

We find the reasoning of *Hochbrunn* and other relevant cases analogous here. Again, taken in context, as the trial

---

of my . . . children as my . . . beneficiaries may determine in their exclusive discretion.

284 Mont. 114, 943 P.2d 981, 982 (1997) (emphasis added). The court reasoned that the language imposed only a moral or ethical obligation on the father and stepmother, and that the purported trustees were given no tangible guidance on fulfilling the best interests of the testator's children. *Id.* at 987.

court found, Testatrix clearly intended that her estate be divided into four equal portions among her daughters. Her choice of the "courteous" words, "I trust" daughter Kathy to distribute the Canal House as if it were unencumbered by Kathy's loan, is similar to the "request" language in *Hochbrunn.* As the Supreme Court held in *Hochbrunn,* we hold here that Testatrix's use of the courteous language, "I trust," taken in light of the surrounding circumstances, expressed her intention to impose an obligation on Kathy ultimately to distribute the Canal House proceeds equally among the four sisters. *See In re Estate of Milton,* 48 Wn.2d 389, 393, 294 P.2d 412 (1956) (finding as imperative, "The . . . legacy is given in contemplation and on the condition that"); *Cowles v. Matthews,* 197 Wash. 652, 656, 86 P.2d 273 (1939) (finding as imperative, "It is my will and desire").

The 1987 contract between Testatrix and Kathy further supports that Testatrix never intended Kathy to receive a greater share of the Canal House than her sisters. The contract provides: "[T]he intention of all the parties is that when the loan is paid off in full, [Kathy's and her husband's interest in the Canal House] will be *returned* to [Testatrix] so that she will again be the *sole* owner." (Emphasis added.) Significantly, the contract also provided that if Testatrix died before the loan was paid off, her "heirs [were] to receive their shares as though the title to [the Canal House] was in the *sole* name of" Testatrix. The will in existence at that time divided all of Testatrix's estate equally between Kathy, Carole, Patricia, and Diane's children.

There are other repeated testamentary expressions of equal treatment for the Testatrix's four daughters. The close proximity of the codicil language, "pay off the loan," to the command, "then give," indicates that "[t]he two ran together in [Testatrix's] mind." *See Hochbrunn,* 138 Wash. at 417. That same language restricts Kathy's discretion concerning her disposition of the property. The simple inclusion of the codicil language, "I trust [Kathy] to then

give," in the sentence immediately following the devise of the Canal House to Kathy, demonstrates that the purported devise was not intended to be absolute. Testatrix's intent to cancel the codicil (and, correspondingly, the devise of the Canal House to Kathy) upon the repayment of the loan during Testatrix's lifetime, evinces her intent to create for Kathy a mandatory duty to divide the Canal House equally among the four sisters, following Testatrix's death.

## B. Other Restatement Factors

The remaining RESTATEMENT factors also support the creation of a trust: There are definite beneficiaries and property, equal familial relationships between Testatrix and her beneficiaries, and a naturally desired result (i.e., equal treatment of four daughters) from the imposition of a trust. The trial court discussed "the financial situation of" Kathy only, stating that Testatrix expressed her wish that her death not accelerate collection of Kathy's loan; nevertheless, Testatrix's clear intent was that her four daughters ultimately receive equal shares of her estate.

We hold that a testamentary trust was created by the "I trust . . ." language, such that Carole, Diane, and Patricia each should have been awarded a one-fourth, rather than a one-sixth, interest in the Canal House sale proceeds.

## III. Promissory Estoppel

In light of our ruling on the legal effect of the codicil, we need not reach the promissory estoppel issue. Reversed.

ARMSTRONG, A.C.J., and SEINFELD, J., concur.

Review denied at 140 Wn.2d 1016 (2000).