# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re the Estate of Leora M. Givens, | ) | No. 68354-3-I |
| Deceased. | ) ) ) | DIVISION ONE |
| ROY ANTHONY GIVENS, | ) ) | |
| Appellant, | ) ) | |
| v. | ) ) | |
| RHONDA MARY BROWN, | ) ) | UNPUBLISHED |
| Respondent. | ) ) | FILED: August 12, 2013 |

Cox, J. — A court's paramount duty in construing a testamentary instrument is to give effect to the maker's intent.[1] That intent must be gathered from the instrument as a whole and specific provisions must be construed in light of the entire document.[2]

Here, Leora Givens made a 2003 testamentary trust that is unambiguous on which of two agreements for the sale of her stock in a corporation was to control at the time of her death. Specifically, the Stock Redemption Agreement, dated January 2004, controlled because it was "finalized." The agreement had

---

[1] In re Estate of Riemcke, 80 Wn.2d 722, 728, 497 P.2d 1319 (1972).

[2] Id.

been executed by all parties and the sale of stock closed prior to her death. Roy Givens, one of Leora's adult children, presents arguments to the contrary in this appeal. These are wholly unpersuasive. Moreover, the trial court correctly decided that Leora was not competent when she executed a transfer-on-death agreement for a nonprobate asset. We affirm the trial court in all respects.

Leora and Rocelius Givens had seven children.[3] Rocelius and a business partner started a company called Pantrol, Inc. in 1974. In 1988, Rocelius retired from Pantrol but continued receiving compensation as a consultant.

Roy worked full time for Pantrol after he graduated from college. None of the Givens's other children had a similar relationship to Pantrol.

In 1989, Roy purchased 49 percent of Pantrol's stock from Rocelius's business partner. At the time, Rocelius and Leora owned the majority interest of 51 percent.

Ten years later, Rocelius and Leora gifted 2 percent of Pantrol's stock to Roy. As a result, he then owned the majority interest in Pantrol.

In 2000, Rocelius, Leora, and Roy signed a Stock Cross-Purchase Agreement. This agreement gave Roy and his wife the first option to buy the entire 49 percent of stock in Pantrol that Leora and Rocelius then owned, upon the death of both. The maximum price was $1 million.

In 2001, Rocelius died. After his death, Leora continued to receive Rocelius's consultant compensation from Pantrol even though she never worked there.

---

[3] We adopt the naming conventions of the parties for clarity.

In 2003, Leora and Roy began to negotiate a Stock Redemption Agreement. It appears this was intended to replace the old agreement for the sale of the minority interest in Pantrol. It further appears that the new agreement was not finalized as of July 2003.

Unbeknownst to Roy, Leora executed a pour-over will and living trust that month. The trust instrument is dated July 7, 2003. The instrument expressly references the Stock Redemption Agreement.

The trust instrument further states, "I intentionally and with due deliberation do not leave any portion of the rest, remainder, and residue of my estate to ROY ANTONY [sic] GIVENS, due to his interest in PANTROL, Inc."

On January 1, 2004, Leora sold her minority interest to Pantrol for $1 million by way of the Stock Redemption Agreement. This purchase price was paid by retiring all outstanding debt owed by Leora to the corporation in the approximate amount exceeding $378,000 and the execution of a promissory note of over $621,000 by the corporation to Leora for the deferred balance. The agreement expressly provided that it "shall take precedence" over the 2000 Stock Cross-Purchase Agreement.

In 2005, Leora suffered a stroke. In 2006, she moved into The Gardens at Town Square, an assisted living facility, in Bellevue. Leora lived in the unit that provided care to residents with dementia.

On January 24, 2006, Leora was admitted to Northwest Hospital's geropsychiatry unit because of "delusions, aggressive and intrusive behavior and

3

physical care intolerance." On February 13, 2006, Leora was discharged from this unit and returned to The Gardens.

One day after her discharge, Leora appears to have signed a transfer-on-death account agreement dated February 14, 2006 for her accounts with Ameriprise Financial. In this agreement, she designated that all of her living children would be beneficiaries of her accounts upon her death.

Leora died on May 1, 2010. The will was probated and the King County Superior Court appointed Rhonda Brown, one of Leora's daughters, as the personal representative of Leora's estate.

In early 2011, Roy petitioned under the Trust and Estate Dispute Resolution Act of 2000 ("TEDRA") for certain relief. He requested that the court enforce the transfer-on-death account agreement dated February 14, 2006 so that he could share in the accounts with his siblings. He also sought an interpretation of Leora's living trust instrument to the end that payments under the Stock Redemption Agreement be made to him, not the estate.

The trial court denied both requests. It decided that Leora was not competent when she signed the transfer-on-death account agreement. Further, it concluded that the trust instrument was unambiguous. Roy was not entitled to payments under the promissory note. Specifically, the court decided that "Mrs. Givens was no longer a shareholder; she was a creditor of Pantrol and the income stream to which she was entitled passes under paragraph 5.1(b), as part

4

of the residue of her estate."[4] The court also denied both parties' requests for attorney fees under TEDRA.

Roy then moved for reconsideration and a new trial, which the trial court denied.

Roy appeals.

## STANDARD OF REVIEW

Roy argues that the TEDRA proceeding in this case was akin to a summary judgment proceeding and all issues should be reviewed de novo. He is wrong.

Under TEDRA, the trial court has "full and ample power and authority . . . to administer and settle . . . [a]ll matters concerning the estates and assets of incapacitated, missing, and deceased persons, including matters involving nonprobate assets . . . ."[5] At a TEDRA "initial hearing," the hearing must be "on the merits to resolve all issues of fact and all issues of law" unless "requested otherwise by a party."[6] Further, "[a]ny party may move the court . . . for summary judgment, in the original petition, answer, response, or reply, or in a separate motion, or at any other time."[7] At TEDRA proceedings, the testimony of witnesses may be by affidavit.[8]

---

[4] Clerk's Papers at 422.

[5] RCW 11.96A.020(1)(a).

[6] RCW 11.96A.100(8).

[7] RCW 11.96A.100(9).

[8] RCW 11.96A.100(7).

Here, Roy petitioned for relief under TEDRA. He asked the trial court to determine Leora's testamentary intent and to uphold the beneficiary designation for her transfer-on-death account. At the initial hearing, the parties agreed that the trial court could decide these two issues based only on a written record.

Given the parties' agreement, it is difficult to understand the argument that Roy now makes that the proceeding below was for summary judgment. Summary judgments are not designed to resolve conflicting factual assertions. Rather, they are intended to determine whether there are any genuine issues of material fact for trial.

Here, there were conflicting declarations over Leora's competence to execute the agreement regarding disposition of the nonprobate asset. The trial court thus made findings of fact and conclusions of law. In so doing, the trial court necessarily weighed conflicting evidence for some of the issues in this case. Accordingly, we review any findings of fact for substantial evidence.[9] And we review the "'trial court's conclusions of law de novo to see if they are supported by the trial court's findings of fact.'"[10]

Roy argues for a de novo standard of review based on a mischaracterization of the proceeding below. As we already explained, he asked the trial court to determine disputed issues. That is what the court did.

---

[9] Petters v. Williamson & Assocs., Inc., 151 Wn. App. 154, 163, 210 P.3d 1048 (2009).

[10] Id. at 164 (quoting Bingham v. Lechner, 111 Wn. App. 118, 127, 45 P.3d 562 (2002)).

6

Additionally, Roy relies on two unpublished cases to support his argument. This violates RAP 10.4(h) and GR 14.1. Neither has precedential value because they are unpublished.

## TESTAMENTARY INTENT

Roy argues that the trial court erred when it determined that the trust was unambiguous. He contends that it was Leora's intent to leave her interest in Pantrol as well as her right to receive payments under the Pantrol promissory note to him. He is wrong on both counts.

When construing a testamentary instrument, this court's paramount duty is to give effect to the maker's intent.[11] That intent must be gathered from the instrument as a whole and specific provisions must be construed in light of the entire document.[12]

If possible, this court will determine the intent at the time of the instrument's execution from the language of the instrument itself and the surrounding circumstances.[13] "The testator is presumed to be familiar with the 'surrounding circumstances' that could affect the [instrument's] construction."[14]

"When, after reading the [testamentary instrument] in its entirety, any uncertainty arises about the testator's intent, extrinsic evidence, including

---

[11] Riemcke, 80 Wn.2d at 728.

[12] Id.

[13] In re Estate of Price, 73 Wn. App. 745, 754, 871 P.2d 1079 (1994); In re Estate of Bergau, 103 Wn.2d 431, 436, 693 P.2d 703 (1985).

[14] Price, 73 Wn. App. at 754.

7

testimony of the drafter, may be admitted to explain and resolve the ambiguity."[15]

The terms of a trust instrument are ambiguous if they are susceptible to more than one meaning.[16]

In general, testamentary intent is a question of fact.[17] But interpreting a specific provision in a trust instrument is a question of law that this court reviews de novo.[18]

Here, the trial court correctly determined that the trust instrument is unambiguous. Subsection (a) of Article 5 states:

> Having spoken with [my six other children], I wish for the following to occur at my death:
>
> *If at the time of my death the Stock Redemption Agreement between PANTROL, Inc. and myself has not been finalized*, thereby invoking the 2000 Stock Cross-Purchase Agreement, I leave any interest in PANTROL, Inc. that I may own or that may be distributed to my estate to ROY ANTHONY GIVENS.[19]

This provision is conditioned on the Stock Redemption Agreement *not* being finalized at the time of her death. Because this agreement *was* finalized prior to Leora's death, this condition was not met. Thus, the remaining part of subsection (a) does not apply.

---

[15] In re Estate of Mell, 105 Wn.2d 518, 524, 716 P.2d 836 (1986).

[16] Waits v. Hamlin, 55 Wn. App. 193, 200, 776 P.2d 1003 (1989).

[17] Eisenbach v. Schneider, 140 Wn. App. 641, 651, 166 P.3d 858 (2007).

[18] In re Estate of Curry, 98 Wn. App. 107, 112-13, 988 P.2d 505 (1999).

[19] Clerk's Papers at 400 (emphasis added).

Under the Stock Redemption Agreement, Pantrol purchased Leora's 49 percent minority interest in Pantrol for $1 million. Thus, she had no interest in Pantrol at the time of her death. The sale was closed prior to Leora's death and all that was left was her right to receive payments under the note that Pantrol executed for the deferred balance of the purchase price. Simply stated, as of her death, Leora had no ownership interest in Pantrol to leave Roy or anyone else.

As the trial court correctly concluded, after Leora closed the sale of her shares to Pantrol, evidenced by the Stock Redemption Agreement, she "was no longer a shareholder."[20] "[Leora] was a creditor of Pantrol and the income stream to which she was entitled passes under paragraph 5.1(b), as part of the residue of her estate."[21]

Subsection (b) of the trust instrument explains that all of Leora's children, except for Roy, would equally share the residue of her estate. This subsection further provides:

> I intentionally and with due deliberation do not leave any portion of the rest, remainder, and residue of my estate to ROY ANTONY [sic] GIVENS, due to his interest in PANTROL, Inc.[22]

Leora's intent is clear based on the language of the trust instrument and the surrounding circumstances. Leora did not leave any portion of the residue of her estate to Roy.

---

[20] Id. at 422.

[21] Id.

[22] Id. at 401.

Roy argues that he is entitled to receive the payments on the deferred balance of the sale to Pantrol, which is evidenced by the promissory note. One problem with this argument is that he fails to point to any language in the trust instrument that entitles him, as opposed to the estate, to such payments. By conflating the stock sold to Pantrol with the payments due on the promissory note, he attempts to ignore the difference between the two. The trial court correctly rejected this argument.

Roy contends that the trust instrument's statement that Leora had spoken with her six other children about her intentions regarding subsection (a) reveals her intent to give a bequest to Roy.[23] He asserts that "a common sense interpretation" of that statement is that "she wanted them to understand her bequest to Roy Anthony."[24] He contends that "it would make little sense that she needed them to understand or approve his disinheritance."[25]

The better reading of the trust is that she wished to explain which agreement would control the terms and conditions of her sale of the minority interest in Pantrol, the 2000 agreement or the 2004 agreement that succeeded it. In either event, it was Leora's intent that Roy would receive the benefit of "any interest in Pantrol" that she might own at her death. But she had no such interest at the time of her death because she had previously sold it to Pantrol in 2004.

---

[23] Appellant's Brief at 18; see also Clerk's Papers at 400 (stating in subsection (a), "Having spoken with MARSHA MARIE MARSH, SHARON ANN GIVENS, RHONDA MARY BROWN, BRENDA IRENE GIVENS, CRAIG FRANCIS GIVENS, TERRI ELIZABETH GIVENS, I wish for the following to occur at my death . . . .").

[24] Appellant's Brief at 18.

[25] Id.

Roy asserts that the conditional part of the sentence, "if at the time of my death, the Stock Redemption Agreement . . . has not [been] finalized," cannot be read in isolation from the "later expressed intent" in the same sentence.[26] It is unclear what such "later expressed intent" means.

What is clear is that the plain words of Leora's trust instrument state that this sentence is **conditioned** on the Stock Redemption Agreement not being "finalized" as of her death. Because the Stock Redemption Agreement was fully executed and performed at closing of the sale of stock, the express condition of the trust instrument did not arise.

## CAPACITY TO CONTRACT

Roy next argues that there was not clear, cogent, and convincing evidence to rebut the presumption that Leora was competent to execute the transfer-on-death account agreement dated February 14, 2006 for her Ameriprise accounts. He is wrong again.

### *Transfer-on-Death Account Agreement*

Without citation to any relevant authority, Roy asserts that the transfer-on-death account agreement is analogous to a will. In contrast, the estate argues that the agreement is a contract. We agree with the estate.

A payable-on-death or transfer-on-death account is one way to transfer property at death.[27] This type of account is "established during the lifetime of the decedent according to the rules of the [financial] institution so that on the death of

---

[26] Appellant's Brief at 20.

[27] 26 CHERYL C. MITCHELL AND FERD H. MITCHELL, WASHINGTON PRACTICE: ELDER LAW AND PRACTICE § 2:35 (2d ed. 2012).

the decedent, the funds are then payable as described."[28] Generally, this type of asset passes outside of probate.[29]

Here, the transfer-on-death account agreement is a contract with the financial institution. It is not analogous to a will for several reasons. First, this is an agreement between Leora and Ameriprise, and it is subject to Ameriprise's rules. Second, Leora signed this agreement without the formalities required of wills. Third, unlike wills, this type of asset generally passes outside of probate.[30]

In sum, whether Leora had the capacity to enter this agreement should be analyzed under contract law.

*Capacity*

Roy argues that the estate failed to present clear, cogent, and convincing evidence to rebut the presumption that Leora had capacity when she signed the transfer-on-death account agreement. He asserts that this court should either find that Leora had capacity to sign the agreement or remand this issue for a full evidentiary hearing. We disagree.

To have capacity to contract, a party must "possess[ ] sufficient mind or reason to enable him to comprehend the nature, terms, and effect of the contract in issue."[31] Whether a party had capacity to contract is a question of fact

---

[28] Id.

[29] Id.

[30] See id.

[31] Page v. Prudential Life Ins. Co. of Am., 12 Wn.2d 101, 109, 120 P.2d 527 (1942).

determined at the time of the transaction.[32] Further, the law presumes that a party has capacity to contract.[33] This presumption can be rebutted only by clear, cogent, and convincing evidence.[34]

"When a challenged factual finding is required to be proved at trial by clear, cogent, and convincing evidence, we incorporate that standard of proof in conducting substantial evidence review."[35] In other words, when a factual finding is challenged, "the question to be resolved is not merely whether there is substantial evidence to support it but whether there is substantial evidence in light of the 'highly probable' test."[36]

Here, the trial court concluded that the evidence demonstrated that Leora lacked capacity when she signed the transfer-on-death account agreement. The court principally relied on a summary that explained Leora's diagnosis when she was discharged from Northwest Hospital's geropsychiatry unit. The date of discharge stated in the summary was one day before Leora signed the transfer-on-death account agreement. Other evidence before the court included a declaration from Dr. Eric Schendel, Leora's treating physician at Northwest Hospital and a declaration from Karen Ingrassia, Leora's nurse at The Gardens.

---

[32] Id.

[33] Id.

[34] Id.

[35] In re Melter, 167 Wn. App. 285, 301, 273 P.3d 991 (2012).

[36] Id.

In opposition, Roy presented evidence from Dr. John Tran, a doctor who was not Leora's treating physician and only reviewed her medical records.

In the discharge summary, Dr. Schendel gave the following diagnosis:

| | |
|---|---|
| ***Axis I.*** | Dementia with delusions and ABD. H/O depression. |
| ***Axis II.*** | Deferred. |
| ***Axis III.*** | H/O CVA and TIA, hypertension, H/O DVT, H/O recurrent UTI, recurrent shingles (resolved). |
| ***Axis IV.*** | Stressors severe. |
| ***Axis V.*** | GAF estimated at 15.[37] |

In its written order, the trial court referred to the American Psychiatric Association's Diagnostic and Statistical Manual (DSM-IV-TR).[38] The court used this manual to define "Axis V. GAF estimated at 15."[39] The court quoted the DSM-IV-TR to explain that "'Axis V is for reporting the clinician's judgment of the individual's overall level of functioning' excluding physical limitations."[40] The court also used the manual to verify that a score of 15 was out of 100.[41]

The discharge summary also described Leora's behavior:

Behaviorally patient was quite inappropriate in the beginning, disrobing in public, agitated and delusional, at one time believing that a male staff was her husband, at another time believing she was having a baby. Gradually her behavior improved, although there remained a tendency to sun-down in the evening.[42]

---

[37] Clerk's Papers at 285.

[38] Id. at 421.

[39] Id.

[40] Id. at 421 (quoting AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-IV-TR (4th rev. ed. 2000)).

[41] Id.

[42] Id. at 284.

14

In Dr. Schendel's declaration, he testified that "[g]iven Ms. Givens' dementia and especially the nature of her delusions, it is my professional opinion that she was unable to manage her affairs or her funds in her own best interest."[43]

Nurse Ingrassia, Leora's nurse at The Gardens, testified in her declaration that Givens was admitted to Northwest Hospital's geropsychiatry unit because she was aggressive toward staff.[44] When she returned from the hospital, her aggressive behavior lessened but "[h]er severe memory loss, her unawareness, and her inability to understand remained just as extreme . . . ."[45]

Roy submitted a declaration from Dr. Tran to support his position that there was not enough evidence to prove that Leora lacked capacity when she signed the transfer-on-death account agreement. But, as noted above, Dr. Tran's opinion was based on his review of Leora's medical records. He was not her treating physician.

In sum, after weighing the evidence, the trial court did not err in concluding that this evidence showed by the clear, cogent, and convincing standard of proof that Leora lacked capacity when she signed the transfer-on-death account agreement.

Roy argues that the trial court did not rule on objections to extrinsic evidence or identify any evidence on which it relied. But there was no

---

[43] Id. at 332.

[44] Id. at 327.

[45] Id. at 328.

15

requirement for it to do so. We presume that the trial court did not rely on inadmissible evidence in making its decision.[46]

Moreover, as the estate points out, in its written order, the trial court stated, "Each side submitted affidavits concerning various peoples' observations of Mrs. Givens, many of which were properly objected to because they violate the dead man's statute."[47] While the trial court did not specifically identify the parts of the testimony it did not consider, this statement is sufficient to evidence the court properly ruled on evidentiary issues. No more is required.

Roy contends that the trial court relied on improper independent research when it looked to the DSM-IV-TR to define "Axis 5. GAF estimated at 15." Roy made the same argument in his motion for reconsideration.

In its order denying this motion, the trial court specifically addressed this argument:

> Of particular note is the argument that the court engaged in irregularity in referencing DSM-IV-TR in its order. However, the decedent's medical records were part of the material submitted by the petitioner [Roy] in support of his original motion. Those records, submitted by petitioner and discussed during argument in the hearing, contain the Axis V diagnosis in the discharge summary, which by definition references the current edition of the DSM . . . . Reference to the DSM IV TR is not referring to a learned treatise not cited by the parties; it is akin to a reference to Webster's Dictionary.[48]

Roy makes three arguments why the trial court's reliance on the DSM-IV-TR was improper. But they are not persuasive.

_____

[46] State v. Read, 147 Wn.2d 238, 245, 53 P.3d 26 (2002).

[47] Clerk's Papers at 421.

[48] Id. at 469.

16

First, Roy cites <u>Lockwood v. AC & S, Inc.</u> to assert that "[o]nly outside research that does *not* prejudice a party is permissible."[49] But <u>Lockwood</u> involved a juror introducing "novel evidence" into jury deliberations.[50] Referencing the definition of a term found in admissible evidence is not akin to "novel evidence."

Second, Roy argues that under the learned treatise exception to the hearsay rule, a trial court cannot "consider any aspect of a learned treatise until proper foundation and submittal has been made by counsel."[51] But this hearsay exception applies when a learned treatise is "called to the attention of an expert witness upon cross examination or relied upon by the expert witness in direct examination."[52] Here, Dr. Schendel did not call attention to the DSM-IV-TR in his declaration. The reference to this manual was contained in the discharge summary that Roy himself presented to the court. Thus, it appears that this evidentiary ruling does not apply to the order's citation to this manual.

Third, Roy argues that the trial court cannot "take judicial notice of medical diagnostic tools to reach its conclusion" under ER 201.[53] But ER 201 "governs only judicial notice of adjudicative facts." An adjudicative fact is one that helps

---

[49] Appellant's Brief at 29 (citing <u>Lockwood v. AC & S, Inc.</u>, 44 Wn. App. 330, 722 P.2d 826 (1986)).

[50] <u>Lockwood</u>, 44 Wn. App. at 357.

[51] Appellant's Brief at 29 (citing ER 803(a)(18)).

[52] ER 803(a)(18).

[53] Appellant's Brief at 29 (citing ER 201).

"explain who did what, when, where, how, and with what motive and intent."[54] "In short, an adjudicative fact is the sort of fact that is normally determined by the jury."[55] The definition of "Axis 5. GAF 15" is not the type of fact determined by a jury.[56] Thus, the definition is not an adjudicative fact that a trial court could take judicial notice of under ER 201.

Roy also challenges the content of Dr. Schendel's and Nurse Ingrassia's declarations. These challenges make no difference in the outcome of this case.

First, Roy asserts that the Dr. Schendel's declaration was not admissible because he had "no independent recollection of treating Leora Givens." But Dr. Schendel also testified that he referred to his records regarding Leora, including his discharge summary, to give his opinion about Leora's ability to manage her affairs. Thus, he had a basis for his opinion.

Second, Roy contends that Dr. Schendel failed to identify a time frame of his opinion, specify the basis of her release, and address any periods of Leora's lucidity. While Dr. Schendel's declaration does not contain this information, the discharge summary identified the time frame for Leora's diagnosis. The discharge summary further explained Leora's improvement regarding her aggressive behavior and that Leora had a "tendency to sun-down in the evening."

---

[54] 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 201.2 (5th ed. 2012).

[55] Id.

[56] See id.

Third, Roy argues that Nurse Ingrassia's testimony that Leora was incapacitated since her stroke ignored the fact that Leora had made decisions about her health care and executed a will after her stroke. While this may be true, Nurse Ingrassia also testified that Leora's "dementia progressed" after her stroke, which led to her admittance to Northwest Hospital.

In sum, the trial court properly determined that there was clear, cogent, and convincing evidence to rebut the presumption that Leora had capacity when she signed the transfer-on-death account agreement. Roy's arguments fail.

## WAIVER OF EVIDENTIARY HEARING

Roy argues that he did not waive his right to an evidentiary hearing if this matter is remanded on either issue. Because there is no reason to remand, we need not decide this issue.

## ATTORNEY FEES

The estate argues that we should award the personal representative attorney fees under TEDRA. We agree.

Under RCW 11.96A.150(1), "any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings . . . ." "In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved."[57]

---

[57] RCW 11.96A.150(1).

First, this litigation obviously benefits the estate by establishing that Roy is not entitled to any of the payments due under the promissory note executed to Leora by Pantrol. On that basis alone, fees are awardable.

Second, while the trial court concluded that fees were not awardable for that phase of the litigation, we take a different view regarding fees on appeal. Roy's challenge to the trial court's reading of the trust had no reasonable basis for being reversed. The trust is unambiguous. And the trial court's determination that Leora was not competent when she signed the agreement is well supported by this record. Under these circumstances, and in view of the diminishment of the estate by the expenditure of fees and costs by this appeal, we deem it proper to award fees to the estate, subject to its compliance with the RAPs to establish amounts.

We affirm the trial court in all respects and award fees to the estate, subject to its compliance with the RAPs to establish amounts.

_____Cox, J._____

WE CONCUR:

_____Leach, C.J._____          _____Dwyer, J._____